ANTHONY CLARK, WILLIS JONES, ROBERT WIN-SPEAR, AND J. M. MINOR *v.* E. WILLETT, S. WILLETT, J. D. JONES, HENRY FORD, J. N. JONES, E. JENKINS, D. GRIFFES, AND PETER WILLETT.

AUTHORITY OF ATTORNEY TO ACT.—Attorneys are officers of the Court, and answerable to it for the proper performance of their professional duties. They appear and participate in its proceedings only by the license of the Court.

IDEM—POWER OF COURT TO PASS UPON THEIR AUTHORITY TO ACT.—An attorney's license is *prima facie* evidence of his authority to appear for any person whom he professes to represent; but if the supposed client denies his authority the Court may require him to produce the evidence of his retainer under the supervisory power which it has over its own process and the acts of its officers. This the Court may do either upon the direct application of the person or party represented, or upon motion of the attorney of the opposite party to dismiss, founded upon the affidavit of the person or party concerning whom the motion is made.

EVIDENCE—MODE OF PROVING VALUE OF DITCH.—The ordinary and proper mode of proving the value of a water ditch is by showing its capacity, the market value of water in the vicinity, and the probable duration of the demand.

IDEM. — In such case evidence of the value or profits of certain mining claims belonging to the owners of the ditch and supplied therefrom with water to mine the same, is inadmissible in evidence to establish the value of the ditch, unless accompanied by further evidence showing that the claims could not be worked without the aid of the ditch.

EVIDENCE AS TO CAUSE OF INJURY TO WATER DITCH.—Plaintiffs brought action to enjoin the defendants from the further mining, tunneling, and drifting of their mining claims beneath the surface of the earth across and on top of which plaintiffs' ditch extended, and which had already somewhat settled and the earth beneath it become cracked, on the ground that said ditch, the right of way for which was older than the mining right of the defendants, would be irreparably injured by reason of the further settling, cracking, and caving of said earth, which, as was alleged, would be caused thereby. The defendants joined issue on said last point. The plaintiffs offered to prove at the trial, in support of their side of said issue, that at a point in the vicinity, but below defendants' claims, where, as was alleged, similar conditions to those of defendants' claims and contemplated mining operations existed, the earth had been caused to settle; crack,

and cave. The evidence was excluded on defendants' objection thereto as irrelevant and incompetent. *Held*, that the evidence was properly excluded.

IDEM.—In such case, as the cause of the settling and cracking of the earth at the surface is matter of opinion rather than direct and positive testimony, the proper mode of proof is to take the opinions of witnesses who have examined the premises and who are qualified by learning, observation, and experience to judge intelligently of the cause.

IDEM — LEGAL PRESUMPTION AS TO FINDINGS OF FACT.—Where in such case the trial was by the Court without a jury, and judgment passed for the defendants without any findings of fact being made, the legal presumption is that the Court below found all the issues for the defendants.

IDEM—EFFECT OF ON APPEAL, IN LAW AND EQUITY CASES.—In such case where an appeal is taken from the judgment and an order denying a new trial, and the statement on motion for a new trial contained the evidence, this Court will examine the latter for the purpose of determining whether the Court below found any of the material issues contrary to the evidence, when, if it be found that a substantial conflict existed, the judgment will be affirmed; if there was not, and the evidence was against the judgment, it may be reversed and a new trial ordered. This is equally the rule in cases at law and in equity.

IDEM — RIGHT TO INJUNCTION IN SUCH CASE. — The rights of the parties in such cases are peculiar. While the plaintiffs have a right of way for their ditch upon the surface, the defendants have also a right to mine in the bowels of the earth beneath, which rights are not necessarily incompatible. In such case the maxim, *qui prior est tempore potior est jure*, is not of controlling weight, but it falls under the maxim, *sic utere tuo ut alienum non lædas*.

IDEM. — How far, in such a case, where no negligence is charged against the defendants, a Court of equity will interfere by injunction is not decided.

IDEM. — Whether ditch property in the mineral regions of this State, although conceded to be real estate, is to be regarded by Courts of equity with the same measure of favor which is bestowed by them upon land which is held and cherished by the owner for *itself*, and not put to use for an ulterior object, is doubted, but not finally decided.

APPEAL from the District Court, Fourteenth Judicial District, Placer County.

The facts are stated in the opinion of the Court.

*Charles A. Tuttle*, for Appellants.

We submit that the judgment is against law, and that it is not warranted by the evidence. The Court erred in granting the defendants' motion to dismiss the suit as to Jones, one of the plaintiffs. ( *Younger* v. *Board of Commissioners*, 29 Cal. 149.) If the plaintiff Jones was dissatisfied with the suit, or with his attorney, he should have discharged his attorney

and employed a new one. The Court erred in its refusal to allow plaintiffs to prove the value of the use of the water to us in our claims. (*Maeris* v. *Bicknell*, 7 Cal. 263.) As to the refusal of the Court to allow us to prove the effect of similar work on similar ground, we say this was the best evidence that could be introduced on this subject.

The evidence shows that the ditch was prior in location to the claim. This brings plaintiffs clearly within the Act of Congress, approved July 26th, 1866. (U. S. Laws 1865–66, p. 253.) Section nine of this Act provides that "whenever by priority of appropriation, rights to the use of water  *  * right of way of ditches and canals,  *  * is hereby acknowledged and confirmed." We are placed by this Act in privity with the source of title—the United States. If the United States could stop the defendants from drifting out the ground, we can.

There is no conflict of evidence as to the defendants drifting under our ditch, and having washed away the earth in front of it. There is no conflict in the evidence on the point, that the ditch, over the drifting, had settled and cracked, and the water run out. In fact, the only attempt at a defense in the defendants was to show by one of them that in his opinion the future work of defendants cannot affect the dith. He does not say that it has not affected it. The washing away of the claim and causing it to settle is waste, and entitles us to an injunction. (*More* v. *Massini*, 32 Cal. 590.) No case similar to this is found in our reports, but in the English reports a parallel case is found in which the whole question is fully discussed. (*Humphries* v. *Brogden*, 12 Ad. & Ell.)

*B. F. Myres*, for Respondents.

All injury and causes of injury complained of were accomplished facts before suit brought. Of course, no injunction could restrain past injuries, nor past causes of injury, and nothing save an injunction is asked for. In no view of

the case can the injury or damage to the ditch, if any, be regarded as irreparable. The defendants are perfectly responsible, and the water can be carried across their claims, as it now is, with but trifling expense. It is clear that the claims of defendants cannot be worked without their conveying the water across them, and it is also clear that the water of the ditch now passes, and did at the beginning of this action, across defendants' claims with perfect safety. It is also clear that Clark, one of the plaintiffs, consented to the erection of the flume over defendants' grounds, that no water has been lost to plaintiffs since, and that portion of the ditch has remained unaffected since that time. No damage can result from anything appearing in the record but that has its remedy at law.

It would appear both from the complaint and Clark's testimony that the ditch will be destroyed anyway by work done before suit brought. If this is so, no injunction could very well prevent it, unless we adopt the seeming idea of appellants' counsel, that an injunction possesses the marvelous force of undoing what has already been done, and suppressing things passed as well as things to come.

Prior possession cuts no figure. No right of way is questioned. The Act of Congress leaves miners and ditch owners upon the public lands to stand in relation to each other as they did prior to its passage. It gives to neither any right over the other which he did not otherwise possess. This is obvious from the first section of the Act as well as from the section cited. As between the Government and the citizen, that which would otherwise have been a trespass is now a sanctioned right; but as between the parties to this suit neither can invoke its aid any more than the other. While the defendants' solvency would be no answer to a *destruction* of the property, yet it is an answer to injuries not irreparable.

The complaint shows no ground for injunction. It charges, substantially, that the drifting will destroy the ditch, and then declares such drifting to have been done a year before.

But as the drifting has been done, and the ditch not yet destroyed, the destructive charge must be untrue. Again, it is alleged that the work already done will probably destroy the ditch. If this is so, what use for any injunction?

By the Court, SANDERSON, J.:

In the Court below judgment passed for the defendants. The plaintiffs moved for a new trial, which was denied, and then appealed. The case comes here upon the pleadings, a bill of exceptions, and a statement on motion for a new trial. The bill of exceptions does not relate to any question affecting the merits of the controversy, but to the power of the Court below to go behind the license of an attorney, and inquire as to his authority to appear for his client.

The bill shows that when the case was called for trial the defendants' attorney, appearing on behalf of one of the plaintiffs—Willis Jones—who was present in Court, moved to discontinue the case as to him, and in support of the motion, presented an affidavit made by Jones to the effect that the action had been brought without his consent and against his will; that his name had been used without authority; that he was opposed to the prosecution of the action, and desired it to be discontinued as to him. This motion was resisted by counsel for the plaintiffs, who claimed that the Court had no power in the premises. The Court held otherwise, and ordered the action to be discontinued so far as the plaintiff Jones was concerned.

Counsel for the appellants claim that this order was erroneous, and cite the case of the *Commissioners of the Funded Debt of the City of San José* v. *Younger*, 29 Cal. 147. That was a very different case. The Commissioners had retained counsel to bring the action. A trial had been had, resulting in favor of the Commissioners, and a new trial granted. At that stage of the case the Commissioners, without substituting another attorney of record, and without the knowledge of their attorney of record, compromised the action, and

authorized the attorney of defendant, in writing, to appear for them and dismiss the action, which he did; but the motion was resisted by the Commissioners' attorney of record, upon the ground, among others, that he was still the attorney of record of the Commissioners, and as such entitled to manage and control the case until displaced and another substituted of record. The Court, nevertheless, dismissed the action, and this Court reversed the judgment, holding, in effect, that where a party retains an attorney to bring or defend an action, the attorney has the right to control and manage the case until he has been superseded by another, in the manner dictated by the tenth section of the statute in relation to attorneys and counsellors, which provides that an attorney in an action or special proceeding may be changed at any time before final judgment: First—Upon his consent, filed with the Clerk or entered upon the minutes; Second—Upon the order of the Court, or Judge thereof, on the application of the client. The question there was, whether the Court was bound to recognize the attorney of record as possessing the right to manage the case, or could at pleasure ignore him all together, and recognize another as having that right. But the question here is, whether the Court has the power to inquire as to the retainer of the attorney, upon the suggestion of the client that he has abused the license of the Court, and brought the action without any authority. Upon such a question we have no doubt as to the power. Attorneys are the officers of the Court, and answerable to it for the proper performance of their professional duties. They appear and participate in its proceedings only by the license of the Court, and if they undertake to appear without authority from the party whom they profess to represent, the act is an abuse of the license of the Court, which, upon the application of the supposed client, the Court has the power to inquire into and correct summarily. Otherwise, the very fountain of justice might become polluted, and a license to stir its waters become a license to defile them.

An attorney's license is *prima facie* evidence of his authority to appear for any person whom he professes to represent, but if the supposed client denies his authority, the Court may require him to produce the evidence of his retainer, under the supervisory power which it has over its process and the acts of its officers, and that, too, in the mode which was adopted in this case, as was suggested in *Turner* v. *Caruthers*, 17 Cal. 431.

It has also been held that the Court may require an attorney to show special authority, upon the application of the opposite party, *when justice requires it. McKiernan et al.* v. *Patrick et al.*, was an action by McKiernan and Anderson, as the indorsees of two promissory notes. The defendants held a setoff as against McKiernan, and made a motion for an order upon the plaintiffs' attorneys to produce their authority for using the name of Anderson, which motion was supported by an affidavit to the effect that the notes in suit were the exclusive property of McKiernan, against whom they held a setoff; that Anderson was a myth, or if not, his name had been fraudulently used, without authority, for the purpose of avoiding the defendants' setoff as a defense to the action.

The plaintiffs' attorney showed cause, and informed the Court that they received the notes from McKiernan, with instructions to sue as had been done; that they had had no communication with Anderson, and had no personal knowledge of him, but they understood that he was a friend and near neighbor of McKiernan in Alabama; that since the motion was made they had written to both of the plaintiffs for information, but had received no answers. The Court denied the defendants' motion. Subsequently, judgment passed for the plaintiffs, and the defendants appealed, and specified as error the overruling of their motion for a rule upon the plaintiffs' attorneys to show by what authority they prosecuted the suit in the name of Anderson; and the appellate Court reversed the judgment, with instructions to retry the rule, and if the plaintiffs' attorneys failed to produce

satisfactory authority for bringing the action in the name of Anderson, to dismiss it.    (4 How., Miss., 333.)

It is proper to say, in conclusion, that we impute no misconduct to counsel for the plaintiffs in this case.    Their character and standing at the bar is sufficient assurance that they did not abuse their license.    It frequently happens that counsel are employed by parties acting for themselves and their associates.    If, as in this instance, it turns out subsequently that some of them were opposed to suing and desired to discontinue, no blame can attach to counsel.

We now come to the merits of the case.    The only relief sought by the plaintiffs is an injunction.    They allege that they are the owners of a ditch, such as is used in the mineral regions of this State for the conveyance of water for mining purposes, of a capacity sufficient to carry four hundred and fifty inches of water; that the ditch has heretofore, and will hereafter, if not destroyed, yield them net profits to the amount of many thousand dollars yearly; that said ditch extends along the side of a steep mountain, of from one to two thousand feet in height, and that the mountain, at a point about five miles below the head of the ditch, is composed of earth and gravel to the depth of from fifty to one hundred feet beneath the surface; that said earth and ground is easily washed and dug away, and that if an excavation is made below the ditch and within a distance of fifty feet, it is liable to cause a slide which will destroy the ditch; that the defendants are in possession of a mining claim at the point designated, extending from a point below the plaintiffs' ditch across the line of the ditch, and back into the mountain a distance of more than a thousand feet; that the claim is about one hundred and fifty feet in width; that the defendants have sluiced away the earth and gravel below the ditch to a point within fifteen feet of it, so as to leave a perpendicular bank about one hundred feet in height, which has caused the ground under and near the ditch to crack, and that there is great danger that the earth will slide and carry away the ditch; that the defendants have also run tunnels

and drifts into their claim at a point about one hundred feet below the plaintiffs' ditch, perpendicular measurement, and by means thereof have caused the surface of the earth over which the ditch extends, to settle and crack, so that in the Winter and Spring of 1866–67 the water would not flow in the ditch, but escaped through said cracks and fissures, and in consequence thereof a flume had to be constructed. across defendants' claim, as a substitute for the ditch; that the tunnels and drifts of the defendants are about six feet in height; that the defendants are still tunneling and drifting, and threaten to tunnel and drift hereafter; that the work already done will probably cause the bank to settle and slide off during the coming wet season, to the destruction of the plaintiffs' ditch, and if the defendants continue their work the ditch will certainly be destroyed, and the plaintiffs will no longer be able to realize any profit therefrom. It is also alleged that the plaintiffs' right of way is older than the mining right of the defendants. There is no allegation that the defendants are not working their mine in the usual or customary mode, or that they have neglected or are neglecting to place under the superincumbent earth sufficient supports to maintain the surface in its natural position. ·

The defendants demurred to the complaint, on the grounds of insufficiency and ambiguity. The demurrer was overruled, and they then answered, admitting that the plaintiffs' ditch was older than their claim, but denying that the capacity of the ditch was sufficient to carry more than eighty-five inches of water, or that the mountain was composed of earth and gravel to a depth of more than twenty feet, and alleging that next underneath the ground came hard rock—cement. That their tunnels and drifts are not less than one hundred and sixty feet, perpendicular measurement, below the plaintiffs' ditch; and they deny that the cracks and fissures came in consequence of their tunnels and drifts. They also deny that they sluiced within less than thirty-five feet of the ditch, or that their sluicing has injured, or will injure the ditch; and they allege that no sluicing has been done since more

than two years prior to the commencement of this action, and that, if it caused any damage to the plaintiffs, the damage was accomplished long before the suit was brought. They also allege that the only paying part of their claim, and the only part they intend to work, lies at a depth of not less than one hundred and sixty feet below the surface, and that as they advance into the bowels of the mountain, the depth will increase. That they have already advanced beyond the perpendicular plane of the plaintiffs' ditch at least twenty feet, and that the work they are now doing, and intend to do, cannot possibly destroy or injure the plaintiffs' ditch. While they deny that their work caused the cracks and fissures in question, they allege that they, at the request of the plaintiffs, constructed a flume across their claim, which has since carried, and still does carry, all the water of the ditch without loss. They lastly deny the value of the profits of the ditch, and allege that the destruction of the ditch would cause no irreparable injury to the plaintiffs.

At the trial two exceptions were taken by the appellants to the ruling of the Court rejecting testimony offered by them : 1st, as to the profits realized by them from certain mining claims, which they owned and worked with water from their ditch at a point below the defendants' claim; and 2d, as to the effect of tunneling and drifting upon the surface of the ground at a point below the defendants' claim, where, as alleged, the formation and composition of the earth was similar to the formation and composition of the earth at the defendants' claim, and where, as claimed by them, the effect of tunneling and drifting had been to cause the surface of the earth to settle, crack, and cave.

The only issue to which the first could be relevant was as to the value of the ditch. Testimony as to the value of their claim could not, as we perceive, tend to establish the value of the ditch, unless accompanied by further evidence showing that the claim could not be worked without the aid of the ditch. It was not proposed to prove that the water conveyed in the ditch was the only available water for working

the claim. In the absence of some such special reason as that suggested, we think the value of the ditch, if material, should have been proved in the ordinary way, by showing its capacity, the value of water for mining purposes in the vicinity, and the probable duration of the demand. That mode of proof was unaffected by the fact that the plaintiffs used the whole or a part of the water themselves. Its market value would have been its value to them also.

We also think the testimony in relation to the effect of tunneling and drifting in another but similar locality was properly rejected. The cause of the settling and cracking of the surface of the earth under the circumstances of this case is matter of opinion rather than direct and positive testimony. The proper course in such cases is to take the opinion of witnesses who have examined the premises, and are qualified by learning, observation, and experience to judge intelligently of the cause. While the opinions of such witnesses may be founded mainly upon their observation and experience in other like cases, it is well settled that they cannot, on the direct examination, be questioned as to particular instances. The reason of this rule is obvious. Different witnesses might have different theories. Their opinions might be founded upon the observance of several and distinct instances. If allowed to adduce one, they may adduce all. The opposite party would have a legal right to controvert each particular case mentioned by the witnesses, and yet be unable to avail himself of the right because of his inability to anticipate the cases mentioned and prepare for their investigation. Moreover, such a course, in addition to the objection just mentioned, would lead to innumerable side issues, and render the trial of a cause interminable, distractive, and enormously expensive. (1 Greenl. on Ev., Sec. 448; (*Central Pacific R. R. Co. of California* v. *Pearson, ante* 247.)

The remaining point made by the appellants is, that the evidence made a case for an injunction, and therefore the Court below erred in denying it. The testimony bearing

directly upon this point is not voluminous, and we will therefore refer to it.

Davidson, a surveyor, testified that the earth under the ditch is composed of gravel and cement; that twenty feet of the top is cement; that there is a tunnel running from the bank under the plaintiffs' ditch; that he went into the tunnel, and found that the ground under the ditch, and in front of it, had been drifted out; that the drifts were about six feet in height; that the tunnel and drifts are one hundred and sixty feet lower than the ditch, perpendicular measurement; that he found one cave in the drift of several feet in length; that the drifting had a tendency to weaken the subjacent support of the surface. This witness also testified that the sluicing off of the earth in front of the ditch, which, as the case shows, was done some two years and a half prior to the commencement of the action, also had a tendency to weaken the lateral and subjacent support which the ground affords to the ditch.

Anthony Clark, one of the plaintiffs, testified that the ground first cracked in March, 1867, which, as the case shows, was two years after the sluicing had been discontinued, and some six months before the commencement of the action; that the cracks were large enough to swallow all the water of the ditch; that he called the attention of the defendants to the cracks, and told them that he thought they ought to put in a flume, which they (the defendants) did; that the flume, when in, carried the water over the cracks; that the ground cracked again in the following April; that Ford, one of the defendants, called his attention to it, and asked him to turn off the water, so that they could put in more flume, which was done. As to the formation of the earth, and the effect upon its surface of the defendants' sluicing, tunneling, and drifting, he testified substantially the same as the witness Davidson. He also testified that "the ditch would be destroyed *anyway* by the work which the defendants had done before the action was commenced;" that the surface

of the earth has settled some five or six inches, and the ditch cannot now be used, except in connection with the flume.

Willard, the ditch agent of the plaintiffs, testified as to the cracks and settling of the surface, substantially the same as the last witness, and that he knew of no cause for it, except the doings of the defendants.

Upon the foregoing testimony, so far as the effect of the defendants' work upon the ditch is concerned, the plaintiffs rested their case. It is to be observed, at this place, that the plaintiffs neither alleged in their complaint, nor attempted to show by their testimony, either that the defendants had not or were not conducting their mining operations in the usual and customary mode, and with ordinary and reasonable care and skill.

Willett, one of the defendants, testified, and admitted, in effect, that the mining operations of the defendants had probably caused the settling and cracking of the surface, but that they had built a flume in place of the ditch, which answered every purpose equally as well as the ditch, with which the plaintiffs seemed satisfied at the time. That the ground they were working at the time the action was on trial, and the only ground which they expected to work thereafter, was on a horizontal plane one hundred and sixty feet below that of the plaintiffs' ditch, and from thirty to forty feet further into the bowels of the mountain than the perpendicular plane of the ditch. That, in his opinion, the work being done and to be done will not injure the plaintiffs' ditch, but that, should it result in a slide and the destruction of the ditch, the water could be easily carried across their claim in an iron or hose pipe, and that they (the defendants) would have it to do, because they could not work their mine without conducting the water across it. That the defendants are solvent, and have expended thirty or forty thousand dollars in working their claim, which is rich in gold, and worth from fifty to sixty thousand dollars.

Earl, whose testimony was more favorable to the plaintiffs than the defendants, by whom he was called, testified that

drifting further back would cause the bank to cave, giving as the reason for his belief, that the air will cause gravel and cement to slack.

Jones testified, in substance, that further work by the defendants, in the manner proposed, could not injure the ditch; that the defendants were doing their work carefully, and filling up as they advanced, leaving the earth about as solid as it was before; that, if the ditch should give way, there would be no difficulty in conveying water across the claim in a flume, as now, or by an iron or hose pipe; that the water now runs in the flume as well as it did in the ditch; that all the work which can injure the ditch was done long before the suit was commenced.

Willis Jones, the plaintiff in whose behalf the Court had discontinued the case, testified to the same effect as the last witness.

The foregoing is, in substance, all the testimony bearing upon the point before us. No finding of facts was made by the Judge below, and we must, therefore, presume that he found all the issues against the plaintiffs. The question then is: Did he find any of the material issues contrary to the evidence? Into that question we can look no further than to see whether there is a substantial conflict. If there is, we must affirm the judgment. If there is not, and the evidence is against the judgment, we may reverse it and grant a new trial. Such is the rule of this Court, and in respect to its application there is no distinction between cases in equity and cases at law.

The only material issue, as we consider, in view of the relief sought, which is an injunction upon further work by the defendants, without damages for past injuries, is, whether such work, if allowed to go on, will irreparably injure the plaintiffs' ditch, for, assuming that the injury which the ditch has already sustained was caused by the mining of the defendants, the act has already transpired, and is, therefore, past prevention. As to the effect of the work which they are now doing and propose to do, the testimony is not only

conflicting, but its weight is against the theory of the plaintiffs. But were it otherwise, an injunction would hardly be granted, if it be true, as stated in the complaint, that the work already done will probably cause the destruction of the ditch, and especially if it be true, as stated by the plaintiff Clark, while on the witness stand, that " the ditch will be destroyed *anyway* by the work which was done before the suit was commenced." If the destruction of the ditch be inevitable, as Clark seems to think, irrespective of future work, we are unable to perceive how, by preventing the work, the ditch can be saved from destruction. If the destruction must come " anyway," we are unable to perceive how even a Court of equity can prevent it. Assuming, then, that an injunction would have been allowed, if it had been applied for at the time the work of defendants first threatened injury to the ditch, we think it clear that the plaintiffs have delayed their application until it is too late. So far as we can judge, an injunction would be ruinous to the defendants, and of no benefit to the plaintiffs.

What we have said disposes of the case, but we desire to add, in conclusion, that we do not wish to be understood, from the manner in which we have treated it, as implying that an injunction would, under any circumstances, be allowed in this case. Upon that point we express no opinion. The relative situations and rights of the parties are peculiar. While the plaintiffs have a right of way for their ditch upon the surface, the defendants have also a right to mine in the bowels of the mountain. Such rights are not necessarily incompatible, and we do not, therefore, consider that the maxim : *Qui prior est tempore, potior est jure,* is of controlling weight. On the contrary, the case would seem to fall under the maxim : *Sic utere tuo ut alienum non lædas.* How far a Court of equity will interfere, if at all, where such are the conditions, and no negligence charged, as in this case, it is unnecessary to consider. The general rule undoubtedly is that a party in possession of the surface of land is entitled to the lateral support which the adjacent soil affords, and the

perpendicular support which is afforded by the subjacent strata. But how far that principle will be enforced when, as here, the surface is used merely for the purpose of a ditch, in which to carry water for the purpose of trade and traffic, which possibly can be carried just as well in some other way, with but a trifling additional expense, and without any detriment to the trade in water, has not, so far as we are advised, been determined. Whether ditch property in the mineral regions of this State, although conceded to be real estate, used as it is for the purposes of trade and commerce, is to be regarded by Courts of equity with the same measure of favor which is bestowed by them upon land which is held and cherished by the owner for *itself*, and not merely put to use for an ulterior object, admits at least of serious doubt. Such ditches are more or less temporary. They are not valuable *as land*. Their value depends entirely upon the demand for water, and when the demand has ceased they become worthless. The qualities upon which the common law grounds its peculiar fondness for land, and the reasons why Courts of equity will interfere to protect it, would therefore seem to be measureably wanting. (See the case of *Humphries* v. *Brogden*, 12 Queen's Bench, Ad. & Ellis, 739; and *Gibson* v. *Puchta*, 33 Cal. 316.)

Judgment affirmed, and remittitur directed to issue forthwith.